**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LAUREN C. MANERCHIA | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C. A. No. 09-447-GMS |
| | : | |
| MICHAEL ASTRUE | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### I.    INTRODUCTION

On June 16, 2009, plaintiff Lauren Manerchia ("Manerchia") appealed from a decision of defendant Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433m 1381-1383f.  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending are cross-motions for summary judgment filed by Manerchia and the Commissioner.  (D.I. 10, 13)  Manerchia seeks an award of benefits in her favor or, alternatively, to reverse and remand the Commissioner's decision.  (D.I. 10)  The Commissioner requests his decision be affirmed.  (D.I. 13)  For the reasons set forth below, Manerchia's motion is granted, and the Commissioner's motion is denied.  The decision of the Commissioner dated May 2, 2008 is reversed, and this matter is

remanded for further findings and/or proceedings consistent with this Memorandum.

## II. BACKGROUND

On November 8, 2005, Manerchia filed applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income. (D.I. 9 at 107-114). Both applications alleged disability beginning May 14, 2004. (D.I. 9 at 107). Following the Social Security Administration ("SSA") denial of her claim, both initially and upon reconsideration, Manerchia requested a hearing before an Administrative Law Judge ("ALJ"). (D.I. 9 at 86). Pursuant to that request, a hearing before an ALJ occurred on March 18, 2008. (D.I. 9 at 31-68). At the hearing, testimony was elicited from Manerchia and an impartial vocational expert ("VE"), James Michael Ryan ("Ryan"). (*Id.*) On May 2, 2008, the ALJ, Melvin D. Benitz, issued his decision denying Manerchia's claim for benefits. (D.I. 9 at 15-30). The ALJ concluded Manerchia is "not disabled under sections 216(I) and 223(d) of the Social Security Act." (D.I. 9 at 30). Subsequently, the Appeals Council denied a request for review. (D.I. 9 at 1-4). On June 16, 2009, Manerchia filed the present appeal under consideration. (D.I. 1).

### A. Medical Evidence

On May 14, 2004, Manerchia was involved in a motor vehicle accident. She began treatment related to her injuries from the accident with Dr. Renzulli on June 3, 2004 when she complained of neck and shoulder pain and intermittent headaches. Manerchia was prescribed Percocet and placed off work through July 30, 2004. (D.I. 9 at 198). Manerchia returned to Dr. Renzulli on July 28, 2004 and was diagnosed with cervical myofascitis. She was prescribed Flexeril and referred for chiropractic

2

treatment. (D.I. 9 at 197). On September 1, 2004, Manerchia returned to Dr. Renzulli, who noted she was doing well and responding to chiropractic treatment and physical therapy. Dr. Renzulli also noted Manerchia found the Flexeril "too sedating". (D.I. 9 at 197).

On September 30, 2004, Manerchia began treatment with Dr. Bruce Katz at First State Orthopedics. (D.I. 9 at 342-3). During that visit, Dr. Katz reviewed her cervical spine x-ray which revealed collapse of the C6-7 disc space. Dr. Katz discontinued the chiropractic and physical therapy treatment and referred her for an MRI to rule out herniated disc. (D.I. 9 at 343).

On October 5, 2004, an MRI of her cervical spine at Diagnostic Imaging Associates was performed which revealed cervical spondylosis with multiple disc protrusions and spurs at C3 through C7 with the most prominent disc protrusion centrally and to the right at C6-7. (D.I. 9 at 338).

On November 3, 2004, Manerchia returned to Dr. Renzulli who diagnosed myofascitis and a cervical herniated disc. Dr. Renzulli continued Manerchia on off work status until January 8, 2005. (D.I. 9 at 196). Two days later, on November 5, 2004, Manerchia underwent a left C7 selective nerve root block performed by James Moran, D.O. at Spine Care Delaware. (D.I. 9 at 180).

Manerchia followed up with Dr. Moran on December 15, 2004. His impression was Manerchia was suffering from "1. probable discogenic neck pain, secondary to whiplash. 2. Left upper extremity radicular symptoms in a C7 distribution, secondary to whiplash. 3. Cervicogenic headache. 4. Cervical and shoulder girdle myofascial pain and spasm, secondary to whiplash. 5. Right HNP, C6-7." Dr. Moran scheduled her for

3

a cervical epidural injection. (D.I. 9 at 332).

On January 7, 2005, Dr. Moran performed another cervical epidural injection. (D.I. 9 at 325). A January 13, 2005 office note from Dr. Renzulli indicates during this followed up visit, Manerchia requested to return to work with restrictions. (D.I. 9 at 196). The medical records fail to indicate whether Dr. Renzulli complied with Manerchia's request, however, an undated record from Dr. Renzulli indicates "no work until able to lift heavy items." (D.I. 9 at 194).

On February 9, 2005, Manerchia returned to Dr. Moran, who noted approximately 50% improvement of "neck, shoulder girdle and arm pain for about two weeks" following the epidural injection, but her symptoms returned. (D.I. 9 at 325). At that time, Dr. Moran advised Manerchia was unable to return to her job which required "physical lifting activities" until after completion of a cervical discography with Dr. Katz. (D.I. 9 at 325). Dr. Moran's clinical update indicated Manerchia was "totally disabled" from February 9, 2005 to March 8, 2005. (D.I. 9 at 326).

On March 8, 2005, Manerchia was examined by Dr. Katz. His office note diagnosed possible shoulder impingement, for which he administered an injection of pain medication in the shoulder, ordered a cervical MRI and EMG of the upper extremity, and continued her out of work status until March 25, 2005. (D.I. 9 at 323-4).

On March 9, 2005, a cervical MRI revealed a "prominent disc protrusion and spur indenting on the dural sac" at C6-7 causing narrowing of right lateral recess, with no other significant interval changes since October 2004. These findings were in addition to the previously noted "right paracentral spur and disc protrusion at C3-4 and mild broad based disc protrusion and spur at C4-5." (D.I. 9 at 321-2). Finally, the MRI

4

indicated a minimally changed "mild broad based disc protrusion and spur at C5-6 indenting on the dural sac." (D.I. 9 at 322).

On March 6, 2005, the EMG of her upper extremities performed by Anthony Cucuzzella, M.D. of Physiatrist Associates, P.A. showed left C7 radiculopathy. (D.I. 9 at 178). On March 23, 2005, after review of those tests, Dr. Katz recommended a left C7 selective nerve root block, and for Manerchia to remain out of work until her next office visit. (D.I. 9 at 318-20).

On March 30, 2005, Manerchia was evaluated by J. Hamilton Easter on behalf of Premier Medical Review. (D.I. 9 at 186-9). Dr. Easter opined Manerchia's symptoms were consistent with tardy ulnar neuroplasty. (D.I. 9 at 188).

Thereafter, the nerve root block was performed on April 8, 2005 at Spine Care of Delaware (D.I. 9 at 179). On April 11, 2005, during that follow up visit, Dr. Renzulli noted temporary relief of symptoms which returned. (D.I. 9 at 313-4, 316-8). On April 11, 2005, Manerchia agreed to surgery. (D.I. 9 at 314).

On April 25, 2005, after receiving additional records, Dr. Easter amended his March 30, 2005 report, wherein he opined Manerchia could return to light duty work and there is no an "anatomical basis for proceeding with any surgery." (D.I. 9 at 183-5). However, on May 18, 2005, another addendum was provided by Dr. Easter. (D.I. 9 at 181-2). By that time, he reviewed the March 2005 EMG report showing left C7 radiculopathy. (D.I. 9 at 181). As a result of the new information, he concluded it was "reasonable to proceed with surgery at the C6/7 level." (D.I. 9 at 182).

Manerchia was scheduled for an "ACDF at C6-7 with allograft or iliac crest bone graft and plating on May 20th." (D.I. 9 at 313). Dr. Katz continued her off work from

5

May 3, 2005 until three months "post op" because she was "totally disabled". (D.I. 9 at 315).

Manerchia was seen post-operatively by Dr. Katz on May 31, 2005. She reported relief of arm pain and headaches. An x-ray showed the plate in good position. Her pain medication was reduced to one Percocet daily, and restrictions on her activities continued. (D.I. 9 at 310-2).

On June 28, 2005, Manerchia followed up with Dr. Katz and reported doing "extremely well." Her only complaint was "some decreased range of motion in her neck." (D.I. 9 at 310). Dr. Katz's physical examination revealed her incisions were healed and her motor strength was 5/5 bilaterally. X-rays showed "good placement of the instrumentation." (D.I. 9 at 310). Physical therapy was prescribed and Manerchia was to remain out of work for an additional six weeks. (D.I. 9 at 310-1). On June 30, 2005, Manerchia began post operative physical therapy with Pro Physical Therapy. (D.I. 9 at 201).

On September 20, 2005, Manerchia complained to Dr. Katz of return of her pre-operative symptoms. (D.I. 9 at 307). An x-ray revealed "some degree of motion at the C6-7 level." (D.I. 9 at 310). On September 27, 2005, Pro Physical Therapy discharged Manerchia after sixteen sessions because due to the non-union, she was unable to progress in physical therapy. (D.I. 9 at 200).

On October 27, 2005, a 3-D CT scan of the cervical spine revealed a non-fusion "of bone graft plug at C6-C7," with lucency between the bone graft and the superior endplate of C7. (D.I. 9 at 306).

On November 1, 2005, Dr. Katz recommended Manerchia remain out of work

6

and continue with conservative treatment for an additional two months. (D.I. 9 at 303). During the December 30, 2005 office visit, Manerchia complained to Dr. Katz of return of pre-operative neck and left arm pain. He concluded the recent tests revealed "questionable motion at the C6-7 level" and discussed possible surgical exploration and fusion. (D.I. 9 at 303).

On March 16, 2006, Dr. Katz performed fusion exploration and posterior spinal fusion with screw fixation and bone graft at C6-7 bilaterally. Surgery revealed the suspected non-union. (D.I. 9 at 276-7). Manerchia remained hospitalized at Christiana Care from March 16, 2006 through March 19, 2006. (D.I. 9 at 263-75). After discharge, Dr. Katz instructed her to remain out of work for three months post surgery. (D.I. 9 at 299).

Manerchia was evaluated by Dr. Kartik Swanithan on March 31, 2006, who diagnosed cervical radiculopathy and cervical arthropathy, which produced significant upper extremity pain, with possible posterior concussion syndrom following a whiplash injury secondary to a motor vehicle accident. He noted Manerchia was wearing a cervical collar secondary to the recent surgery. (D.I. 9 at 278-84).

During a follow up visit on April 28, 2006, Dr. Katz noted good progress, no complaints of any upper extremity symptoms, a well-healed incision and cervical x-rays showing good placement of instrumentation. Manerchia was to remain out of work until her next follow up visit. (D.I. 9 at 297). At the follow up visit on June 3, 2006, Manerchia complained of left arm pain radiating into the shoulder and tricep area and worsening achiness in her neck. She was continued on Percocet 10 mg, four times daily for pain control. Dr. Katz scheduled a CT scan and prescribed a Medrol Dosepak

7

(steroid). (D.I. 9 at 297). Her release from work continued another two weeks. (D.I. 9 at 295-6).

On June 20, 2006, Dr. Palandjan conducted a residual functional capacity ("RFC") examination of Manerchia. He concluded her exertional limits were: occasionally lifting ten pounds, frequently lifting less than ten pounds, standing and/or walking and/or sitting six hours in an eight hour workday with unlimited pushing/pulling. (D.I. 9 at 285-90). Dr. Palandjan further opined her postural limitations were: frequently climbing and occasionally stooping, kneeling, crouching and crawling, occasional (not frequent or continuous) bilateral reaching and unlimited handling, fingering, feeling. No visual or communication limitations were noted. Her environmental limitations were avoid concentrated exposure to extreme cold, heat and vibration and all exposure to hazards, and unlimited exposure to wetness, humidity and noise. (D.I. 9 at 285-90).

On June 22, 2006, a CT scan of her cervical spine revealed satisfactory post surgical changes with no laxity and solid spinal fusion at C6-7 with hardware in good position. However, a mild central disc protrusion indenting on dural sac at C5-6 and a broad-based spur at the lower portion of C3-4 were noted. (D.I. 9 at 293). On June 2, 2006, Dr. Katz noted the CT demonstrated a solid fusion, but due to continued pain, ordered a hardware block. (D.I. 9 at 294). That block was performed on July 7, 2006. (D.I. 9 at 294). During the July 18, 2006 office visit, Manerchia advised the block only provided limited pain relief. As a result, Dr. Katz referred her to Dr. Renzulli and for another MRI of the cervical spine. (D.I. 9 at 292).

On April 8, 2008, Manerchia's pain management physician, Dr. Ann Kim, of First State Orthopedics reported: neck pain affected her mentally, lowering her ability to deal

8

with normal everyday stress; she is unable to complete a normal workday and work week without interruptions from psychologically based symptoms requiring numerous rest periods, and limiting her response to changes in a work setting. (D.I. 9 at 31).

Regarding her physical activity, Dr. Kim opined Manerchia could occasionally lift 20 pounds, frequently lift 10 pounds, only stand and/or sit for four hours each during an eight hour work day, with sitting limited to thirty minutes and standing for fifteen minutes before changing position, and to walk every thirty minutes for ten minutes at a time. (D.I. 9 at 357-8). Dr. Kim further noted Manerchia needs to shift from sitting or standing and will need to lie down at unpredictable intervals during a work day, but could frequently climb stairs, occasionally twist and crouch, with no stooping or climbing ladders. (D.I. 9 at 358-9). Dr. Kim found Manerchia's reaching, handling, fingering, feeling, pushing/pulling were limited, indicating decreased sensation to light touch of the left upper extremity, increased pain and numbness on reaching and pushing/pulling. (D.I. 9 at 359). Dr. Kim recommended avoidance of extreme cold, heat, humidity, cigarette smoke, fumes, odors, dusts and gases, and anticipated Manerchia would be absent from work more than three times per month. (D.I. 9 at 359-60).

## B. Hearing Testimony

### 1. Lauren Manerchia's Testimony

Manerchia testified as a result of the automobile accident in May, 2004, she sustained a cervical herniation, requiring a fusion and a second surgery involving the insertion of hardware. (D.I. 9 at 37). She contends since the accident she has chronic, continuous pain and the surgeries were to improve function and relieve pain. (D.I. 9 at 37).

9

Manerchia initially stated her head and neck pain occur "all the time" and intermittently radiated into her left arm causing numbness, but later testified her head pain happens two to three times per week. (D.I. 9 at 37-8). She endures constant neck pain around the surgical site where the screws and plates are inserted. (D.I. 9 at 39).

Prior to the accident, Manerchia claimed she was very active raising her children, participating in the various school activities and working, but barely can dress herself due to pain. (D.I. 9 at 40). She only drives out of necessity to the doctor or grocery store. (D.I. 9 at 40-41). She is unable to sleep through the night and takes a lot of medication. (D.I. 9 at 41).

Manerchia's medications at the time of the hearing were Oxycodone 10 mg and Percocet 7 ½ mg each four times daily, Flexeril in the evening, Mexalt for migraines, and Gabapentin 300 mg at night, 100 mg in the morning and 200 mg in the afternoon. (D.I. 9 at 41-42). She also takes Voltaren, an anti-inflammatory, 70 mg twice a day and Prozac 40 mg daily. (D.I. 9 at 42). She testified the medications cause severe drowsiness. (D.I. 9 at 45).

She can dress herself, fix a small breakfast, such as a bagel or a bowl of cereal, and load and unload laundry from the washer and dryer, but cannot carry it. (D.I. 9 at 43-44). After helping her husband and children in the morning, she usually lies on the sofa for most of the day. She rarely uses the computer. (D.I. 9 at 44-45). She has been advised by Dr. Kim not to lift more than ten pounds. (D.I. 9 at 46). Sitting for any length of time is painful and requires support for her head. (D.I. 9 at 47). The pain has caused "a very deep depression," resulting in a referral to a "pain psychologist." (D.I. 9 at 48).

10

### 2. The Vocational Expert's Testimony

The vocational expert, Ryan, also testified. (D.I. 9 at 59). Ryan classified Manerchia's past work as a supervisor of cashiers in a retail or wholesale establishment as semi-skilled, heavy exertional level. (D.I. 9 at 60). Ryan opined Manerchia's supervisory and customer service skills were transferrable to light, semi-skilled positions. He did not find such skills transferable to sedentary work. He further classified Manerchia's position as cashier and a bank teller as light exertional, unskilled work. (D.I. 9 at 60).

As part of the hypothetical person proposed by the ALJ, Ryan was asked to assume a 43 year old individual with a high school education and past relevant work as indicated, who is right handed, suffering mainly and generally from degenerative disc disease of the cervical spine, primarily at the C6-7 level, underwent two surgeries, with moderate pain and discomfort, and occasional severe pain of the neck, shoulder and arm and mild depression. (D.I. 9 at 60). The hypothetical person also experiences occasional headaches, partially relieved by medications without significant side effects, except for lethargy, and needs simple, routine, unskilled, low-stress jobs because of pain, depression and reduced concentration and memory. Additional work restrictions included standing for 30 minutes; sitting for ten minutes as needed; lifting 10 pounds with lesser amounts frequently; avoiding heights, hazardous machinery, temperature, humidity extremes, and vibrations; mild to moderate limitation of push-pull movement and grip of the left upper extremity with no repetitive turning of the neck; and avoiding odors, gases, fumes, dust, chemicals and like substances. (D.I. 9 at 61).

In response, the vocational expert testified such a person could perform the

11

following jobs at the light exertional level: (1) security worker, with 500 positions locally

and 52,000 jobs nationally; (2) inspector, with 300 jobs locally and 48,000 positions

nationally; and (3) dispatcher with 250 jobs locally and 38,000 nationally. (D.I. 9 at 61-

62). The vocational expert opined the individual with such limitations could not perform

her past work; and if that person required rest periods of four to five hours per day, she

could not maintain full-time employment. (D.I. 9 at 62-63; 66-67).

## C.    The ALJ's Findings

The Social Security Administration uses a five-step sequential claim evaluation

process to determine whether an individual is disabled:

> [The Commissioner] determines first whether an individual is currently
> engaged in substantial gainful activity. If that individual is engaged in
> substantial gainful activity, he will be found not disabled regardless of the
> medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to
> be engaged in substantial gainful activity, the [Commissioner] will
> determine whether the medical evidence indicates that the claimant
> suffers from a severe impairment. 20 C.F.R. § 404.1520©. If the
> [Commissioner] determines that the claimant suffers from a severe
> impairment, the [Commissioner] will next determine whether the
> impairment meets or equals a list of impairments in Appendix I of sub-part
> P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. §
> 404.1520(d). If the individual meets or equals the list of impairments, the
> claimant will be found disabled. If he does not, the [Commissioner] must
> determine if the individual was capable of performing in his past relevant
> work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the
> [Commissioner] determines that the individual is not capable of performing
> his past relevant work, then he must determine whether, considering the
> claimant's age, education, past work experience and residual functional
> capacity, he is capable of performing other work which exists in the
> national economy. 20 C.F.R. § 404.1520(f).

West v. Astrue, C.A. No. 07-158, 2009 WL 2611224, at *5 (D. Del. August 26, 2009)

(quoting Brewster v. Heckler, 786 F.2d 581, 583-84 (3d Cir. 1986)). Based on the

factual evidence and the testimony of Manerchia and the vocational expert, the ALJ

determined that Manerchia was not disabled and, therefore, was not eligible for DIB or

SSI. (D.I. 9 at 30). The ALJ's Findings are summarized as follows:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.   The claimant has not engaged in substantial gainful activity since May 14, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: depression and degenerative disc disease (20 CFR 404.1520©).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, routine, low concentration, low memory, low stress, unskilled sedentary work as defined in 20 CFR 404.1567(a) except she could sit for 10 minutes, stand for 30 minutes, continuously on an alternate basis during an eight hour day, five days a week, lifting 10 pounds occasionally, lesser amounts frequently, moderately limited to push and pull and grip in the left upper extremity where extreme temperature and humidity, odors, fumes, dust, gases and pulmonary irritants, vibration, heights, hazardous machinery and repetitive turning of the neck could be avoided.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on June 1, 1960 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

13

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560© and 404.1566).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 14, 2004 through the date of this decision (20 CFR 404.1520(g)).  (D.I. 9 at 20-29).

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

The parties cross moved for summary judgment pursuant to Fed. R. Civ. P. 56©. (D.I. 10, 13).  In determining the appropriateness of summary judgment, a court must review the record as a whole and "draw al reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).  If a court determines "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law," summary judgment is appropriate. *Hill v. City of Scranton*, 411 F. 3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56©).

### B.    Review of the ALJ's Findings

A court must uphold factual decisions if they are supported by "substantial evidence."  42 U.S.C. §405(g), 1383(c)(3).  Substantial evidence is not a "large or considerable amount of evidence, but rather 'such amount of evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (citation omitted).  Substantial evidence is further defined as "more than a mere scintilla." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)

14

(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Credibility determinations are, likewise, the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 1, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether this court would make the same determination; but, whether the ALJ's conclusion is reasonable. In social security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56©. *See Woody v. Sec'y of the Dep't of Health and Human Serv.*, 859 F.2d 1156, 159 (3d Cir. 1988).

## IV. DISCUSSION

After considering the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes that the ALJ's decision is not supported by substantial evidence. Specifically, the court finds that Manerchia was disabled for a minimum period of twelve months during the time period May 20, 2005 through June 16, 2006, and the ALJ erred in failing to conduct a full evaluation of Manerchia's disability under listing 1.04 in failing to give controlling weight to the opinions of Manerchia's treating physicians, and in failing to account for all disabling conditions in his hypothetical question to the vocational expert. The court will direct an award of benefits for the time period of May 20, 2005 through June 21, 2006 and will remand to correct the deficiencies and determine Manerchia's disability status for the additional claimed period of disability and after June 21, 2006. Manerchia is directed to provide all medical records on which she relies in support of her disability.

15

## A. Manerchia's disability duration was for a period of at least twelve months

Manerchia claims her disability began on May 14, 2004. (D.I. 12 at 9).

Notwithstanding that Manerchia contends that her disability began on May 14, 2004, she argues during the period of May 20, 2005 through June 21, 2006, her treating physician instructed her to remain out of work secondary to two cervical fusions and there are no conflicting medical reports from other physicians indicating she could work during that time period. (D.I. 12 at 9).

In response to Manerchia's contention she was disabled for a period of at least twelve months, the Commissioner argues Manerchia was not completely disabled, but merely unable to perform her heavy lifting job. (D.I. 14 at 12-13). In support, the Commissioner points to the record between May 2004 through February 2005, emphasizing the conservative treatment rendered and absence of prescribed pain medication. (D.I. 14 at 13). The Commissioner relies on her treating physicians' notes of December 15, 2004, February 9, 2005 and an undated note indicating no lifting. (D.I. 14 at 15).

The Commissioner argues after the first surgery, "the evidence establishes that she was not disabled - she was simply unable to perform her heavy-lifting job," relying on the operative report dated May 20, 2005, a physical therapist report dated June 30, 2005 and Dr. Katz's record of June 28, 2005. (D.I. 9 at 191, 201, 310, 36). Those records indicate that eleven days after the surgery Manerchia reported resolution of arm pain and lessening of headaches. (D.I. 9 at 310). Thereafter, her only remaining complaint was continued decreased range of motion in her neck. (D.I. 9 at 310). The

16

Commissioner notes it was not until September 2005 that Manerchia's physicians first indicated the fusion surgery was unsuccessful. (D.I. 14 at 14).

While the ALJ's denial of benefits from May 14, 2004 through May 20, 2005 is supported by substantial evidence, the denial of benefits from May 20, 2005 to the present time is not. In addition, there is substantial evidence that she could not participate in any substantial activity from May 20, 2005 through June 21, 2006. Manerchia underwent a cervical fusion on May 20, 2005. The first record that the Commissioner refers to in his argument that Manerchia was only disabled from heavy lifting is dated May 31, 2005. Therefore, the Commissioner assumes her physicians would have recommended she return to work only eleven days after a cervical fusion as long as her employment did not involve heavy lifting. Next, the Commissioner relies on a report dated June 28, 2005, when Manerchia complained of neck stiffness but no arm pain. However, the Commissioner has not identified any reports contradicting Dr. Katz's findings that Manerchia should remain out of work or suggesting she could return to work in a light duty capacity.

No evidence contradicts Dr. Katz's findings between May 20, 2005 through June 16, 2006. Even Dr. Swanithan's evaluation of March 31, 2006 did not contradict Dr. Katz's findings regarding her limitations and need to stay out of work. (D.I. 9 at 278-280). Therefore, it is undisputed that Manerchia was disabled for at least twelve months from May 20, 2005 through June 16, 2006 warranting an award of benefits during that time period.

**B.      ALJ's failure to evaluate Manerchia's cervical impairment under listing 1.04 and 1.07.**

17

Manerchia contends the ALJ failed to properly consider and analyze her

disability under Listings 1.04 and 1.07. (D.I. 12 at 9). 20 C.F.R. Pt. 404, Subpt. P, App.

1 § 1.04 ("Listing 1.04") refers to:

[D]isorders of the spine (e.g. herniated nucleus pulposus . . . degenerative
disc disease . . .), resulting in compromise of a nerve root . . . or the spinal
cord. With:

A.     Evidence of nerve root compression characterized by neuro-anatomic
       distribution of pain, limitation of motion of the spine, motor loss (atrophy
       with associated muscle weakness or muscle weakness) accompanied by
       sensory or reflex loss and, if there is involvement of the lower back,
       positive straight leg raising test (sitting and supine);

       OR

B.     Spinal arachnoiditis, confirmed by an operative note or pathology report of
       tissue biopsy, or by appropriate medically acceptable imaging, manifested
       by severe burning or painful dysesthesia, resulting in the need for
       changes in position or posture more than once every two hours;

       OR

C.     Lumbar spinal stenosis resulting in pseudoclaudication, established by
       findings on appropriate medically acceptable imaging, manifested by
       chronic non-radicular pain and weakness, and resulting in inability to
       ambulate effectively, as defined in 1.00B2b.

In addition, 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.0 ("Listing 1.07") refers to:

[f]racture of an upper extremity with non-union of a fracture of the shaft of
the humerus, radius, or ulna under continuing surgical management, as
defined in 1.00M, directed toward the salvage or restoration of major
function, and such major function was not restored or expected to be
restored within 12 months of onset.

The record indicates the ALJ determined Manerchia had severe impairments -

depression and degenerative disc disease - which did not meet or medically equal one

of the listed impairments. In rendering his decision, the ALJ concluded:

[T]he undersigned has particularly considered the listings contained at

18

Sections 1.00 *et seq.* (musculoskeletal disorders) and Sections 12.00 *et seq.* (mental disorders) and finds that the precise criteria of the listings have not been met. The claimant's representative does not contend that a listing has been met or equaled. Moreover, no physician has mentioned any findings equivalent in severity to any listed impairment, nor are such findings indicated or suggested by the evidence of record." (D.I. 9 at 22).

Thereafter, the ALJ analyzed her mental disorder under § 12.00 *et seq.*

In support of her position, Manerchia relies on *Cotter v. Harris*, 642 F.2d 700, 705-06 (3d. Cir. 1981). There the court held that in order for a reviewing court to perform its statutory function of judicial review of an ALJ's findings and conclusions, the record must reflect the ALJ's analysis of the evidence he/she considered as well as the weight given such evidence. Manerchia also points to *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000) which held conclusory statements by an ALJ do not constitute an adequate listing analysis to allow a meaningful judicial review. *Id.* at 119.

In response, the Commissioner maintains the ALJ "fully discussed the record and focused on the evidence of Plaintiff's neck impairment in detail." (D.I. 14 at 19). He further notes "[t]he ALJ observed that Plaintiff did not require an assistive device to walk, could walk without difficulty, and exhibited full strength . . . . [and] also noted that Plaintiff's complaints of upper extremity limitations only pertained to her left arm." (*Id.* at 19-20 *citing* D.I. 9 at 20-24). The Commissioner relies on *Scatorchia v. Commissioner*, 137 Fed. Appx. 468, 470 (3d Cir. 2005) wherein an ALJ is "not required 'to use particular language or adhere to a particular format in conducting the analysis,' but must merely ensure 'that there be sufficient explanation to provide meaningful review of the step three determination.'" *Id.* at 470 citing *Jones v. Barnhart*, 364 F.3d 501 (3d Cir.

19

2004).

*Burnett* noted that "the applicable regulations indicate that it is within the realm of the ALJ's expertise to determine the closest applicable listed impairment, based on the medical evidence when examining whether a claimant's impairments meet or equal a listed impairment . . ." *Burnett*, 220 F.3d at 120. The applicable regulation directing how the ALJ determines whether medical equivalence exists provides:

> [w]e will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment." *Id.* at 120 citing 20 C.F.R. § 404.1526 (1999).

Although *Jones* relaxed the *Burnett* standard by merely requiring an ALJ clearly evaluate the available medical evidence in the record and justify that evaluation, the instant matter is distinguishable from *Jones*. Similar to the present case, the ALJ in *Jones* concluded at step two that the claimant had a severe impairment based on medical findings, but subsequently found at step three that "the claimant's impairments do not meet or equal the criteria established for an impairment shown in the Listings." *Jones*, 364 F.3d at 503. The *Jones* court emphasized even though no specific format is mandated, under *Burnett*, the ALJ was still required to ensure a sufficient development of the record and an adequate explanation of the findings to permit meaningful review. *Id.* at 505.

In *Jones*, the ALJ discussed and weighed the evidence regarding the claimant's disability, relying on the medical history and lack of hospitalization or emergency

20

treatment. Because of that analysis, the *Jones* court found the ALJ satisfied the sufficient explanation requirement of *Burnett*.

Here, Manerchia's four cervical MRI reports performed on October 5, 2004, March 9 and October 2, 2005 and June 22, 2006 showed multiple cervical disc herniations and non-union after the original surgery. Moreover, the ALJ determined Manerchia suffered a severe impairment from degenerative disc disease. Both a herniated nucleus pulposus and degenerative disc disease are specifically identified in Listing 1.04. However, the ALJ conducted only a cursory analysis under Listing 1.00 *et seq.* and based his decision on credibility determinations of Manerchia's treating physicians, the absence of a contention that a listing has been met or equaled, and the purported lack of "findings equivalent in severity to any listed impairment." (D.I. 9 at 22). His conclusion ignores the objective MRI reports an ALJ is required to consider under 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00(C)(1) and Manerchia's treating physicians' reports.

When the ALJ analyzed Manerchia's treating physicians reports at step five, he only documented the doctors' findings and indicated the level of weight accorded. Again, the ALJ never addressed the four cervical MRIs and how this objective testing fit into his analysis under step three. Therefore, remand is appropriate for the ALJ to properly review and analyze the record under Listing 1.04. Since no medical evidence has been presented that Manerchia suffered a fracture and her disabling condition is defined in Listing 1.04, the ALJ is not required to conduct an analysis under Listing 1.07 unless he concludes her disability may also fall under that listing.

## C. Treating Physicians' Medical Opinion

An examining doctor's written report setting forth medical findings in the physician's area of competence "may constitute substantial evidence." *Richardson v. Perales*, 402 U.S. 389, 402 (1971). In determining the proper weight given to such medical opinions, the ALJ is required to weigh all evidence and resolve any material conflicts. *Id*. at 399. "Treating physicians reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir. 1987)). A treating physician's opinion is "entitled to substantial and at times even controlling weight." *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001). It is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ, however, may reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citation omitted). In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). Further, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927" Social

Security Regulation ("S.S.R.") 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

An ALJ may not disregard a treating physician's medical opinion based solely on his impression of the record and evaluation of a claimant's credibility. *See Morales*, 225 F.3d at 318 ("The ALJ cannot . . . disregard [a treating physician's] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant's] credibility.'") (citation omitted). Additionally, some explanation is necessary "for a rejection of probative evidence which would suggest a contrary disposition." *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986). An ALJ may accept some evidence and reject the rest; however, all evidence must be considered, and a basis for rejection must be provided. *See Sterwart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983).

Here, the weight apportioned by the ALJ to Manerchia's treating physicians' reports is not based on substantial evidence in the record. Manerchia treated with Drs. Katz, Moran, Kim and Renzulli. In his opinion, the ALJ assigned "little weight" to all opinions of Manerchia's treating physicians.

First, Dr. Renzulli's opinion was assigned little weight because the ALJ noted it concerns Manerchia's efforts to return to her previous position and the record as a whole indicates she is purportedly able to work at a sedentary exertional level. However, Manerchia generally treated with Dr. Renzulli, her primary care physician, shortly after the accident. Dr. Renzulli's treatment related to the accident ended by January 2005.

Next, the ALJ afforded little weight to the opinions of Drs. Katz and Moran who the ALJ noted, restricted Manerchia from work between February 9, 2005 to August 17,

23

2006. (D.I. 9 at 27). The ALJ determined "no additional evidence has been provided by either of these treating physicians to support a work restriction of 19 months." (D.I. 9 at 27). The record shows, however, that Drs. Katz and Moran's treatment spanned from September 2004 through August 2006 and their findings are consistent with operative reports, objective MRI testing, and Manerchia's subjective complaints. Therefore, the ALJ's determination that these opinions should be afforded little weight is unsupported and inadequately explained.

The ALJ attributed little weight to the mental health opinion of Dr. Kim, finding her "conclusions inconsistent with the record and . . . lack of expertise in vocational training and occupational health coupled with her speciality in orthopedics has not provided balanced review of the claimant's limitations." (D.I. 9 at 27). The ALJ also noted Dr. Kim's conclusions on disabled status to be administrative findings reserved to the Commissioner and assigned "little weight" to the doctor's conclusions on physical limitations because they are "not supported by any treatment notes." (D.I. 9 at 28). The ALJ noted the treatment notes of First Orthopedics "end on July 18, 2006 before Dr. Kim joined the practice. As a result, it is not possible to correlate Dr. Kim's conclusions with actual objective medical evidence that was developed over time." (Id.).

A review of Dr. Kim's report reveals her April 1, 2008 medical opinion regarding Manerchia's mental abilities was based upon the "medical history, the chronicity of the findings (or lack thereof), symptoms (including differing individual tolerances for pain, etc.), and the expected duration of any work limitations." (D.I. 9 at 350). In addition, Dr. Kim explained Manerchia's mental limitations to do unskilled work is attributed to an

24

"inability to complete a normal workday and work week without interruptions . . . perform at a consistent pace without an unreasonable number and length of rest periods . . . [and] deal with normal stress." (D.I. 9 at 351). Further, Dr. Kim noted "[t]he pain lowers [Manerchia's] ability to deal with normal every day stress." (D.I. 9 at 352). Manerchia testified Dr. Kim has her on "a cocktail" of medications which make her significantly lethargic. (D.I. 9 at 49).

The ALJ gave little weight to Dr. Kim's opinions due to her lack of "specialization in any mental health field," noting "[n]o objective evidence supports a conclusion that Dr. Kim ever treated the claimant for mental health related issues." (D.I. 9 at 27). However, given Dr. Kim's training and specialization in pain management, she would seem well qualified to evaluate Manerchia's mental health status. In other words, given her undisputed expertise in pain management and her role as Manerchia's treating physician, Dr. Kim was in a position to observe Manerchia and monitor, understand, and evaluate the efficacy and impact, including mental health impact, of the medications the doctor was prescribing for her patient. In addition, Dr. Kim prescribed Prozac[1] which requires periodic monitoring. Thus, it is abundantly clear that Dr. Kim provided some mental health treatment to Manerchia.

The ALJ also criticized Dr. Kim's opinion regarding physical abilities and limitations because it "is not supported by any treatment notes . . . . As a result, it is not

---

[1] PubMed Health, A service of the United States National Library of Medicine has indicated that "Fluoxetine (Prozac) is used to treat depression, obsessive compulsive disorder . . . some eating disorders, and panic attacks . . . . It works by increasing the amount of serotonin, a naturel substance in the brain that helps maintain mental balance." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/).

possible to correlate Dr. Kim's conclusions with actual objective medical evidence that was developed over time." (D.I. 9 at 27). However, Dr. Kim did, however, relate her medical findings to objective medical evidence including the July 25, 2006 cervical MRI. (D.I. 9 at 358). Further, her conclusions are consistent with those of Drs. Katz, Moran and Renzulli. As a result, the ALJ's assignment of little weight to the medical opinion of Dr. Kim is not supported by substantial evidence.

### D. ALJ's failure to include all of Manerchia's established limitations in his hypothetical to the vocational expert

Manerchia next asserts the ALJ erred by not including all her limitations in his hypothetical. She claims the hypothetical failed to account for limitations identified by her treating physicians, as well as limitations accepted by the ALJ. She relies on *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004) which held a VE hypothetical does not provide substantial evidence of available jobs unless it includes all a claimant's limitations. *Id.* at 552-54.

In response, the Commissioner argues a limitation on social functioning is irrelevant, as vocationally insignificant. The Commissioner also contends the hypo was adequate because it addressed Manerchia's mental health issues by including her depression and lethargy, and limited her to "simple, routine, unskilled jobs, low stress in nature". (D.I. 14 at 25). The Commissioner relies on *Elvin v. Astrue*, Civ. A.No. 07-620-GMS-MPT, 2009 WL 2525487 (D. Del. Aug. 14, 2009). In *Elvin*, this Court found a plaintiff's purported depression was not vocationally significant in the absence of any medical treatment, and he was able to maintain moderate social functioning, use a computer and drive a vehicle short distances. *Id.* at *18.

26

The Commissioner also relies on *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008). *Stubbs-Danielson* is a Ninth Circuit case that held "to the extent the ALJ's RFC finding erroneously omitted [claimant's] postural limitations . . . any error was harmless since sedentary jobs require infrequent stooping, balancing, crouching, or climbing." *Id.* at 1174. However, that case was distinguished in *Mauzy v. Astrue*, 2010 U.S. Dist. LEXIS 62537 (W. Va. June 21, 2010). The *Mauzy* court pointed out "the Ninth Circuit was not deciding whether the ALJ properly formed the RFC in accordance with the mandates of *SSR 96-8p, 1996 SSR LEXIS 5*. Rather, the Ninth Circuit simply examined whether the actual RFC finding was correct." *Id.* at 12, 13, n. 18. Here, since the adequacy of the RFC is not in issue, the Commissioner's reliance on *Stubbs-Danielson* is misplaced.

"[A]n ALJ's hypothetical must include all of a claimant's impairments" that are supported by the record. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F. 3d 112, 122 (3d Cir. 2000). Furthermore, the ALJ may only consider the VE's testimony if the hypothetical "accurately portrays the claimant's individual physical and mental impairments." *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). If the hypothetical fails to properly account for a claimant's impairments and limitations, the VE's testimony cannot be considered substantial evidence. *Ramirez*, 372 F.3d at 552. The ALJ, however, "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2000).

In this matter, as noted previously, the ALJ presented the "hypothetical claimant"

to the vocational examiner. Dr. Palandjian (the examiner on behalf of the
Commissioner) included restrictions of limited reaching in all directions, with no
continuous overhead reaching, and occasional stooping, kneeling, crouching and
crawling, with no balancing. (D.I. 9 at 285-290).

Manerchia's claimed mental impairments were not evaluated by Dr. Palandjian
or any other doctor on behalf of the Social Security Administration. Therefore, the only
evidence of any mental health concerns is Dr. Kim's report and Manerchia's testimony
of medication related lethargy. She also testified Dr. Kim prescribed Prozac for
depression. Further, Dr. Kim's report indicates Manerchia is unable, due to
psychologically based symptoms, to work a normal workweek without interruption and
lengthy rest periods, and deal with normal work-related stress.

While Manerchia emphasizes Dr. Palandjian limited her to no ladder climbing
and only occasional reaching overhead, those restrictions are adequately considered by
the ALJ's hypothetical which included "mildly to moderately limited push-pull, and grip in
the left upper extremity," and jobs that would allow her to "avoid repetitive turning of the
neck due to her cervical problem."

However, the ALJ found Manerchia has a severe impairment from depression
and moderate social functioning limitations. Manerchia's unrefuted testimony showed
continued treatment, including medication, for depression. In addition, she testified she
no longer communicates with family and friends (with the exception of her sister), does
not use a computer and has limited her driving. Therefore, *Elvin* is distinguishable from
this matter. As a result, the ALJ should have incorporated in the hypothetical the
uncontroverted mental health restrictions diagnosed by Dr. Kim and the credible

testimony by Manerchia on which he relied for a finding of severe impairment due to
depression. **E.     ALJ's failure to develop the record**

Finally, Manerchia argues the ALJ failed to develop a complete medical history
by requesting or obtaining additional records. The Commissioner contends the ALJ
satisfied this obligation by leaving the record open after the hearing to allow Manerchia
to submit additional records.

The claimant bears the burden of proving she is disabled. 42 U.S.C. §
423(d)(1)(A); 20 C.F.R. § 416.912(a). This burden includes furnishing medical records
and any other relevant evidence regarding her ability to work and function. 20 C.F.R. §
416.912(a). If, however, the claimant is unable to obtain the medical reports necessary
for a disability determination, the adjudicator will make "every reasonable effort" to
obtain those records only when the claimant gives permission to request those reports.
20 C.F.R. § 416.912(d).

Nothing in the record indicates Manerchia requested the ALJ's assistance to
obtain medical or other documents. During the hearing, the ALJ granted Manerchia an
extension of ten days to supplement her medical history. (D.I. 9 at 67). Thereafter, on
March 31, 2008, her counsel petitioned for an additional ten days, which was granted,
and on April 2, 2008, Manerchia submitted the additional reports from Dr. Kim. (D.I. 9
at 103, 105-6). Although Manerchia indicated difficulty in obtaining records, she never
sought the ALJ's assistance in that regard. In addition, she provides no explanation
why she was unable to obtain the evidence now claimed as missing from the record
when she bears the burden of proving disability. Thus, the court finds in favor of the
Commissioner on this issue.

## V.    CONCLUSION

For the foregoing reasons, (1) Manerchia's motion for summary judgment is granted in part;  (2) the Commissioner's motion for summary judgment is denied in part; (3) an award of benefits is hereby directed in favor of Manerchia for the time period May 20, 2005 through June 16, 2006; and (4) the remainder of this matter is remanded for further findings and proceedings consistent with this Memorandum.

Dated: _Dec 1, 2011_

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAUREN C. MANERCHIA  :
                      :
              Plaintiffs,  :
                      :
    v.                :       C. A. No. 09-447-GMS
                      :
MICHAEL ASTRUE        :
COMMISSIONER OF       :
SOCIAL SECURITY       :
                      :
              Defendants.  :

## ORDER

For the reasons set forth in the Memorandum issued on this date,

**IT IS HEREBY ORDERED** this ___1ˢᵗ___ day of ___December___, 2011,

that

(1)   Plaintiffs's motion for summary judgment (D.I. 10) is GRANTED in part;

(2)   Defendant's motion for summary judgment (D.I. 13) is DENIED in part;

(3)   An award of benefits is hereby directed in favor of Manerchia from May
      20, 2005 through June 16, 2006; and

(4)   The remainder of this matter is remanded for further findings and
      proceedings consistent with the Memorandum.

_____
CHIEF, UNITED STATES DISTRICT JUDGE